Edward **BELL, M.D., McNeilar, Inc., Walgreens Company, Purepac Pharmaceutical, Co., Appellants–Defendants,**

v.

**Hirshell Lee LOLLAR, Appellee–Plaintiff.**

No. 22A01–0212–CV–475.

Court of Appeals of Indiana.

July 17, 2003.

Irma's contributions were gifts, not based upon a need for support by Gunthild.

Laurie Goetz Kemp, Elizabeth Ullmer Mendel, Alice Barns Herrington, Woodward Hobson & Fulton, LLP, Louisville, KN, Attorneys for Appellant Purepac Pharmaceutical Co.

Jeffrey T. Sampson, Sampson, Smith & Slechter, PLLC, Gary Becker, Kevin Renfro, Becker Law Office, Louisville, KN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Purepac Pharmaceutical Company (Purepac) appeals the trial court's denial of its motion for summary judgment. Specifically, Purepac contends that Hirshel Lollar's state law claim for failure to warn about the risk of liver damage from combining acetaminophen and alcohol is preempted by federal law governing the labeling of drugs. Because the Food and Drug Administration's (FDA) regulations governing the labeling of drugs are minimum standards that do not preempt state law, we affirm the trial court's denial of summary judgment.

### Facts and Procedural History

The facts in this appeal are undisputed. In December 1993, Lollar suffered a work-related back injury. As a result of the injury, Lollar's doctor prescribed him acetaminophen plus codeine manufactured by Purepac, which is the generic of Tylenol 3. Lollar continued taking acetaminophen plus codeine until June 1995. During this time, Lollar also regularly consumed alcohol. Specifically, Lollar drank "three to four six packs of beer every Friday night and anywhere between one and six beers on any given night of the week." Appellant's App. p. 59. In June 1995, Lollar was admitted into Floyd Memorial Hospital with complaints of fever, vomiting, diarrhea, and general weakness. After a two-week hospital stay, Lollar was diagnosed with, among other things, alcoholic hepatitis, alcoholic dependency continuous, alcoholic gastritis with hemorrhage, and acute renal failure.

In June 1997, Lollar filed a lawsuit against Purepac and various other defendants; Purepac is the only remaining defendant. Specifically, Lollar alleged that the acetaminophen plus codeine manufactured by Purepac "was in a defective and unreasonably dangerous condition" because the drug's label "fail[ed] to warn [him] ... regarding the risk associated with combining acetaminophen and alcohol." Appellant's App. p. 44. In June 2002, Purepac filed a motion for summary judgment alleging that Lollar's state law claim for failure to warn was preempted by federal law, specifically, the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.* Following a hearing, the trial court denied Purepac's motion for summary judgment. In particular, the trial court found that Lollar's "complaint is not pre-empted by the Federal Food, and Drug, and Cosmetic Act" and that "there exists [a] genuine issue of material fact which preclude[s] the entry of Summary Judgment in favor of" Purepac. Appellant's App. p. 13. Purepac subsequently filed a motion with the trial court to reconsider its summary judgment order or in the alternative to make that order final and appealable. Following a hearing, the trial court issued an amended order making the summary judgment order final and appealable. This appeal ensued.

### Discussion and Decision

Purepac contends that the trial court erred in denying its motion for summary judgment. Specifically, Purepac argues that the FDCA preempts Lollar's state law failure to warn claim. When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it is for the trial court: whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 39 (Ind. 2002). Summary judgment should be granted only if the evidence authorized by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law. *Id.* Here, there is no dispute of the facts. Accordingly, this is a proper case for summary judgment, and our standard of review is de novo. *Id.* Before delving into the parties' arguments regarding preemption, we first lay out the basics of the FDA's regulatory scheme governing drugs.

### I. Federal Regulatory Scheme for Drugs

One aspect of the FDA's mission is to ensure that drugs sold in the United States are safe and effective. *See* 21 U.S.C. § 355(d); 21 C.F.R. § 314.2. As such, the FDCA requires drug manufacturers to obtain FDA approval before introducing new drugs into interstate commerce. 21 U.S.C. § 355(a). To obtain FDA approval, the first applicant to introduce a new drug—the "pioneer" or "listed drug"—must submit a New Drug Application (NDA) containing, among other things, "full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use" and "specimens of the labeling proposed to be used for such drug." 21 U.S.C. § 355(b)(1); *Zeneca, Inc. v. Shalala*, 213 F.3d 161, 163 (4th Cir.2000).

Once the FDA has approved a pioneer drug, the FDCA allows a drug manufacturer desiring to introduce a generic copy of the pioneer drug to seek FDA approval of its generic version through an Abbreviated New Drug Application (ANDA). 21 U.S.C. § 355(j); *Zeneca*, 213 F.3d at 164. The ANDA procedure "permits generic drug applications to piggy-back on clinical findings that [the] FDA has already embraced" in the NDA; thus, ANDA appli-

cants need not duplicate the clinical safety studies that supported the pioneer drug's NDA. *Zeneca,* 213 F.3d at 164 (quotation omitted). The ANDA process, however, does not absolve generic drug manufacturers from other requirements. *See* 21 U.S.C. § 355(j)(2)(A)(i)-(viii). For instance, the FDCA requires generic drug manufacturers to "show that the labeling proposed for the new drug is the same as the labeling approved for the listed drug ... except for changes required because ... the new drug and the listed drug are produced or distributed by different manufacturers" or there are differences in active ingredients, administration, dosage form, or strength. 21 U.S.C. § 355(j)(2)(A)(v), (j)(2)(C). The FDA has interpreted this same labeling requirement as follows:

> Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product *must be the same* as the labeling approved for the reference listed drug, except for changes required because of differences approved under a petition filed under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmacokinetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act.

21 C.F.R. § 314.94(a)(8)(iv) (emphasis added).

## II. Preemption

In May 1979, the FDA approved Purepac's ANDA for acetaminophen plus codeine, the generic of Tylenol 3. Lollar took Purepac's acetaminophen plus codeine from 1993 to 1995. During this time, Purepac's label was identical to Tylenol 3's label, which did not contain a warning about the risk of liver damage from combining acetaminophen and alcohol.[1] Lollar does not dispute this; instead, he argues that the FDCA does not preempt his state law claim for failure to warn because "it is certainly possible to comply with both the federal labeling requirements and common law failure to warn tort actions. For example, an additional warning on the product in question does not render the label in question in conflict with federal law." Appellee's Br. p. 10.

The preemption doctrine is grounded in the Supremacy Clause of Article VI of the United States Constitution, which establishes federal law as the supreme law of the land. U.S. Const. art. VI, cl. 2; *Rogers ex rel. Rogers v. Cosco, Inc.,* 737 N.E.2d 1158, 1163 (Ind.Ct.App. 2000), *reh'g denied, trans. denied.* However, courts do not lightly attribute to Congress or to a federal agency the intent to preempt state or local laws. *Rogers,* 737 N.E.2d at 1164. "The historic police powers of the states are not to be superseded by federal law unless that was the clear and manifest purpose of Congress." *Id.* This presumption against preemption is even stronger when state regulation of matters related to health and safety is

---

1. In fact, it was not until 1998 that the FDA required alcohol warning labels to be placed on over-the-counter drugs containing acetaminophen. Since 1998, the label is required to provide: "**Alcohol Warning**: If you consume 3 or more alcoholic drinks every day, ask your doctor whether you should take acetaminophen or other pain relievers/fever reducers. Acetaminophen may cause liver damage." 21 C.F.R. § 201.322(a)(1).

involved. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). The intent of Congress may be "express"—expressly stated in the statute, or "implied"—implicitly stated in the statute's structure and purpose. *Rogers*, 737 N.E.2d at 1164. We now address whether the FDCA either expressly or implicitly preempts Lollar's state law failure to warn claim.

### A. Express Preemption

■ We first observe that there is no express preemption provision in the FDCA regarding drugs. "Drug" is defined in relevant part as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals . . . [and] articles (other than food) intended to affect the structure or any function of the body of man or other animals[.]" 21 U.S.C. § 321(g)(1). Acetaminophen plus codeine is a drug. Nevertheless, Purepac points to an express preemption provision in the FDCA, specifically 21 U.S.C. § 360k(a), but that provision is located in the Medical Device Amendments of 1976(MDA) portion of the FDCA. That provision provides:

> [N]o State or political subdivision of a State may establish or continue in effect with respect to a *device* intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the *device*, and
>
> (2) which relates to the safety or effectiveness of the *device* or to any other matter included in a require-

ment applicable to the *device* under this chapter.

21 U.S.C. § 360k(a) (emphases added). To implement this section, the FDA promulgated the following regulation:

> Section 521(a) of the act [21 U.S.C. § 360k(a)] contains special provisions governing the regulation of *devices* by States and localities. That section prescribes a general rule that . . . no State or political subdivision of a State may establish or continue in effect any requirement with respect to a *medical device* intended for human use having the force and effect of law (whether established by statute, ordinance, regulation, or court decision), which is different from, or in addition to, any requirement applicable to such *device* under any provision of the act and which relates to the safety or effectiveness of the *device* or to any other matter included in a requirement applicable to the *device* under the act.

21 C.F.R. § 808.1(b) (emphases added).

Because drugs and devices[2] are defined and treated differently, the MDA in general and this express preemption provision in particular do not apply to the case at bar. *See, e.g.*, 21 U.S.C. §§ 360c(a)(1)(C) & 360e (providing that certain devices are subject to a process called "premarket approval," which provides reasonable assurance of their safety and effectiveness). Even if this express preemption provision applied to the case at bar, it would not be dispositive. The United States Supreme Court has held that this provision does not expressly preempt all claims relating to the MDA. *See Medtronic, Inc. v. Lohr*, 518

---

2. "Device" is defined in relevant part as:
 an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory . . . which does not achieve its primary in-

tended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.
21 U.S.C. § 321(h).

U.S. 470, 491, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (providing that "at least some common-law claims against medical device manufacturers may be maintained after the enactment of the MDA."). Because the FDCA does not contain an express preemption provision regarding drugs, the FDCA does not expressly preempt Lollar's state law claim for failure to warn. We now determine whether the FDCA implicitly preempts Lollar's state law claim.

## B. Implied Preemption

 Implied preemption results when a state law conflicts with a federal law. *Rogers,* 737 N.E.2d at 1164. It occurs either where it is impossible to comply with both a federal and a state or local law or where state law stands as an obstacle to the accomplishment and execution of federal purposes and objectives. *Id.* Purepac argues that because the FDCA requires the labeling of the generic drug to be the same as the labeling for the listed drug and Tylenol 3's label did not warn about the consequences of combining acetaminophen and alcohol, it would be impossible for Purepac to comply with Lollar's demands for an additional warning on the drug's label; therefore, Lollar's state law claim for failure to warn is preempted.

Although 21 C.F.R. § 314.94(a)(8)(iv) provides that the labeling of the generic drug "must be the same" as the labeling for the listed drug, there is another provision in the Code of Federal Regulations, specifically 21 C.F.R. § 314.70(c)(2)(i), which provides that once an NDA or ANDA has been approved, the applicant may make changes to the label that "add or strengthen a contraindication, warning, precaution, or adverse reaction" without FDA approval. As a result, several courts have held that "FDA regulations as to design and warning standards are minimum standards which do not preempt state law defective design and failure to warn claims." *Motus v. Pfizer Inc.,* 127 F.Supp.2d 1085, 1092 (C.D.Cal.2000); *see also Hill v. Searle Labs.,* 884 F.2d 1064, 1068 (8th Cir.1989) ("FDA approval is not a shield to liability. FDA regulations are generally minimal standards of conduct unless Congress intended to preempt common law, which Congress has not done in this area.") (citations omitted); *Wells v. Ortho Pharm. Corp.,* 788 F.2d 741, 746 (11th Cir.1986) ("An FDA determination that a warning is not necessary may be sufficient for federal regulatory purposes but still not be sufficient for state tort law purposes."); *Caraker v. Sandoz Pharm. Corp.,* 172 F.Supp.2d 1018, 1033 (S.D.Ill. 2001) ("FDA's drug labeling decisions impose only "minimum" standards that are open to supplementation by state law through a jury's verdict enforcing a manufacturer's common law duty to warn.... Because there is no evidence that either Congress or the FDA intended on scraping state products liability claims based on a failure to warn ..., it is reasonable to find that the FDA has imposed a minimum—as opposed to conclusive—standard of safety."); *Mazur v. Merck & Co.,* 742 F.Supp. 239, 247 (E.D.Pa.1990) ("[M]ere compliance with an FDA suggestion, or for that matter, regulation or order, does not mean that state tort law becomes irrelevant. First, compliance with an FDA regulation may establish that the manufacturer met the appropriate minimum standards of due care, but compliance does not necessarily absolve the manufacturer of all liability. Manufacturers must meet state safety requirements, whether codified or embodied in the common law, in addition to satisfying the initial FDA requirements.") (citation omitted); *Kociemba v. G.D. Searle & Co.,* 680 F.Supp. 1293, 1299 (D.Minn.1988) ("The mere fact that the [drug] received FDA approval does not, by itself, indicate that Congress impliedly intended to preclude state tort actions

against prescription drug manufacturers. This is especially true in light of the widely held view that FDA regulation of prescription drugs establishes *minimum* standards, both as to design and warning."); *Savina v. Sterling Drug, Inc.*, 247 Kan. 105, 795 P.2d 915, 931 (1990) ("[R]egulations imposed by the FDA are minimal standards. A drug company is not prohibited from providing additional warnings and additional information that is not required by the FDA."); *Edwards v. Basel Pharm.*, 933 P.2d 298, 302 (Okla.1997) ("It is the widely held view that the FDA sets minimum standards for drug manufacturers as to design and warnings. We conclude that compliance with these minimum standards does not necessarily complete the manufacturer's duty") (citation omitted).

Although these cases involve pioneer drugs and NDAs and we could not find any cases involving generic drugs and ANDAs, the result is the same. We see no reason to provide greater protection against state law failure to warn claims to generic drugs than to pioneer drugs. The FDA's requirement that a generic drug have the same labeling as the pioneer drug is a minimum standard. That is, the generic drug's label must contain, at the very least, what the pioneer drug's label contains. Here, Purepac used the same label on its acetaminophen plus codeine as the label on Tylenol 3, which the FDA required. Purepac therefore met the minimum standard. However, Purepac was free to strengthen its label by adding an alcohol warning. Accordingly, Lollar's state law claim for failure to warn is not implicitly preempted by the FDCA. We therefore affirm the trial court's denial of Purepac's motion for summary judgment.

Judgment affirmed.

ROBB, J., concurs.

FRIEDLANDER, J., dissents with separate opinion.

FRIEDLANDER, Judge, dissenting.

I believe that Purepac was entitled to summary judgment on Lollar's "failure to warn" claim, and therefore respectfully dissent from the majority's holding to the contrary.

In a nutshell, the majority holds today that Purepac could fully comply with applicable FDA requirements with respect to warning labels, yet still be liable for negligence under Indiana common law. In the majority's view, preemption is not an issue because the FDA regulations concerning warning labels are merely minimum standards established by Congress, which the states are free to supplement with more stringent requirements of their own. We are by no means writing on a clean slate on this question. Although no Indiana court has yet rendered a decision on this precise issue, courts in other jurisdictions have grappled with substantially similar questions. In so doing, the arguments on both sides have been ably laid out and need not be rehashed here at length. Thus, I write briefly to express and explain my view that the majority has come down on the wrong side of the question, and that applicable FDA regulations have indeed preempted Indiana common law with respect to the content of warning labels on drugs.

The majority dismisses as precedent any cases concerning the Medical Devices Amendments of 1976(MDA) "[b]ecause drugs and devices are defined and treated differently," Slip op. at 8, and because the MDA contains an express preemption provision, whereas the Federal Food, Drug, and Cosmetic Act (FDCA) does not. The lack of a preemption clause is by no means conclusive proof that preemption was not

intended. Rather, in such cases, courts must determine whether preemption applies.

When there is no preemption clause, courts are guided first and foremost by the principle that "the purpose of Congress is the ultimate touchstone." *Philip Morris Inc. v. Harshbarger,* 122 F.3d 58, 67 (1st Cir.1997). Implied preemption will be found where the pervasiveness of the federal regulations in question or the dominance of the federal interest in a particular area of legislative activity permits an implication that Congress intended to occupy the field. *Massachusetts Ass'n of Health Maint. Orgs. v. Ruthardt.,* 194 F.3d 176 (1st Cir.1999). "[A] congressional determination to effect a nationally uniform standard presents 'a situation similar in practical effect to that of federal occupation of a field.'" *Philip Morris, Inc. v. Harshbarger,* 122 F.3d at 85 n. 41 (quoting Laurence H. Tribe, *American Constitutional Law,* § 6–29, p. 510 (2d ed.1988)). I believe the FDCA labeling scheme represents a nationally uniform standard. Moreover, the sheer volume and specificity of the scheme set out in the FDCA is sufficient in my view to evince a Congressional intent to "occupy the field" within the meaning of *Ruthardt,* and understandably so. In what is inarguably a national market, one can readily perceive the near impossibility of a pharmaceutical company's task of navigating through the quagmire of what would amount to fifty-one different standards (FDCA regulations plus the respective common-law requirements of the fifty states). Yet, that is precisely the situation created by today's decision.

21 CFR Ch. 1 § 314.94(a)(8)(iv), the FDCA provision in question, provides:

A side-by-side comparison of the applicant's proposed labeling including, if applicable, any Medication Guide required under part 208 of this chapter with the approved labeling for the reference listed drug with all differences annotated and explained. Labeling (including the container label, package insert, and, if applicable, Medication Guide) proposed for the drug product *must be the same as the labeling approved for the reference listed drug,* except for changes required because of differences approved under a petition filed under § 314.93 or because the drug product and the reference listed drug are produced or distributed by different manufacturers. Such differences between the applicant's proposed labeling and labeling approved for the reference listed drug may include differences in expiration date, formulation, bioavailability, or pharmakonetics, labeling revisions made to comply with current FDA labeling guidelines or other guidance, or omission of an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(4)(D) of the act.

(Emphasis supplied.) The above provision is part of a comprehensive regulatory scheme requiring that a proposed drug's label must be the same as that of its reference drug, with limited and well defined exceptions. None of those exceptions (e.g., approved differences, different manufacturer, etc.) apply here. Thus, as I read the FDCA, Purepac's label in this case was required by FDCA regulations to be identical to that of the reference drug. It follows that any duties not embodied in the FDCA's regulatory scheme would necessarily be additional duties imposed by Indiana common law.

In *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the United States Supreme Court determined that, with respect to drug package labeling, duties arising solely under state common law—and not arising under the

MDA—constitute requirements *different from, or in addition to,* FDA requirements. In the face of an MDA provision forbidding a state from establishing requirements that differ from those established in the MDA, the Court concluded that state common law was preempted in that area. Although we are concerned in the instant case with the FDCA and not the MDA, the principle in *Medtronic* applies here as well. State common law may not impose requirements different from or in addition to requirements set out in the FDCA concerning labeling, because Congress has expressed its intent to preempt that area, as explained above.

Applying these principles here, Lollar seeks to impose liability on Purepac based upon a claim of inadequate warning labels. Because Purepac's label complied with FDCA requirements, liability could be premised only upon Indiana state common law principles. In my view, those would constitute forbidden additional requirements in an area that has been preempted by the FDCA. I would enter summary judgment in favor of Purepac.